United States District Court
Southern District of Texas
**ENTERED**
October 20, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **EVANSTON INSURANCE COMPANY,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:19-CV-1498 |
| | § | |
| **AMSPEC HOLDING CORP.,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Pending before the Court[1] is Defendant/Counterclaimant AmSpec Holding Corporation's ("AmSpec") Motion for Partial Summary Judgment (Dkt. No. 16) and Plaintiff/Counter-Defendant Evanston Insurance Company's ("Evanston") Motion for Summary Judgment (Dkt. No. 17). The Court has considered the motions, all other relevant filings, and the applicable law. For the reasons set forth below, the Court **DENIES** Defendant's partial motion for summary judgment, and **GRANTS** Plaintiff's motion for summary judgment.

### I. Background

**A. Factual Background**

The facts are largely undisputed. AmSpec performs testing and inspection services for oil, gas, and petrochemical industries.[2] AmSpec field inspectors travel to ports, refineries, and terminals along the Gulf Coast where they inspect barges and vessels, and take product samples

---

[1] The parties consented to proceed before the Undersigned Magistrate Judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. *See* Dkt. No. 28.

[2] Dkt. No. 16-1 at 1.

back to AmSpec laboratories for quality testing.[3]

1. The Policy[4]

Evanston issued a property insurance policy (the "Policy") to AmSpec, effective from November 15, 2016 to November 15, 2017.[5] The Policy insured multiple AmSpec buildings in Texas and provided coverage for business interruption,[6] extra expense,[7] and real and personal property.[8]

The Policy also extended coverage to Dependent Locations:

> **Dependent Locations** –
> 1. **Coverage** – Coverage for earnings and/or extra expense is extended to loss of earnings or extra expenses that "you" incur during the "restoration period" when "your" "business" is interrupted by direct physical loss or damage, caused by a covered peril, to property at a "dependent location" described on the schedule.[9]

The Policy defines Dependent Locations as "locations that are operated by others and that 'your' 'business' depends on . . . ."[10] The dependent locations at issue in the current case are the ports of Corpus Christi, Texas City, Galveston, Port Arthur, and Houston.[11]

---

[3] *Id.*

[4] For the purposes of this Memorandum Opinion, the Court will only address the portions of the Policy that are at issue in the instant case and relevant to the Court's findings.

[5] Dkt. No. 16-2 at 4.

[6] "Business Interruption means loss resulting from necessary interruption of business conducted by the Insured and caused by direct physical loss or damage by any of the perils covered herein during the term of this policy to Real and/or Personal Property as covered herein." *Id.* at 42.

[7] Extra Expense means "the excess cost necessarily incurred to continue the operation of the Insured's business or facility that would not have been incurred had there been no loss or damage by any of the perils covered herein during the term of this policy to Real and/or Personal Property as covered herein." *Id.* at 43.

[8] *See id.* at 41–43.

[9] *Id.* at 71 (emphasis in original).

[10] *Id.*

[11] Dkt. No. 8 at 5.

The Policy also provided coverage for Interruption by Civil Authority:

> "We" extend "your" coverage for earnings and extra expense to include loss sustained while access to "covered locations" or a "dependent location" is specifically denied by an order of civil authority. This order must be a result of direct physical loss of or damage to property, other than at a "covered location" and must be caused by a covered peril.[12]

2. Timeline

In preparation for a hurricane's arrival, port conditions are used to alert the maritime community to changes in port operations. As explained in one of the bulletins, "[p]ort condition[s] are a gradual, time phased development based on [the] impact of [a] storm and assessment of safety conditions."[13] There are four possible port conditions: Whiskey (gale force winds possible within 72 hours), X-Ray (gale force winds possible within 48 hours), Yankee (gale force winds possible within 24 hours), and Zulu (gale force winds possible within 12 hours).[14] Under port condition Zulu, a port is closed and all port operations are suspended.[15] Below is a timeline of Hurricane Harvey's development with the corresponding port conditions:

- August 13, 2017
  - Hurricane Harvey began as a tropical wave in the Atlantic Ocean.[16]
- August 17, 2017
  - Hurricane Harvey developed into a tropical storm.[17]
- August 18, 2017
  - Hurricane Harvey impacted the Windward islands and eventually weakened to a tropical wave.[18]

---

[12] Dkt. No. 16-2 at 73.
[13] Dkt. No. 16-9 at 2.
[14] *Id.* at 2–3.
[15] *Id.* at 3.
[16] Major Hurricane Harvey, August 25-29, 2017 https://www.weather.gov/crp/hurricane_harvey (last visited September 22, 2020).
[17] *Id.*
[18] *Id.*

- August 22, 2017
    - 1 p.m.: Corpus Christi's Port was set to port condition Whiskey.[19]
- August 23, 2017
    - Hurricane Harvey reformed and was predicted to make landfall as a hurricane somewhere along the Texas coast.[20]
- August 24, 2017
    - Hurricane Harvey officially formed into a hurricane.
    - 6:57 p.m.: Ports of Houston, Texas City, Galveston, and Corpus Christi were set to port condition Yankee.[21]
- August 25, 2017
    - 2 p.m.: Ports of Houston, Texas City, Galveston, and Corpus Christi were set to port condition Zulu and, thus, the ports were closed.[22]
    - 10 p.m.: Hurricane Harvey made landfall in Texas.[23]
- August 28, 2017
    - 6 p.m.: Port Arthur was set to port condition Zulu and, thus, the port was closed.[24]

3. <u>The Claim</u>

On August 30, 2017, AmSpec sought coverage under the Policy for the following locations in Texas: Texas City; Pasadena; La Porte; Freeport; and Corpus Christi.[25]

On the same day, Evanston acknowledged the claim.[26] Evanston retained independent adjusting firm Angle Martin & Associates to investigate the claim.[27] AmSpec retained public

---

[19] Dkt. No. 19-7 at 2. In reference to Dkt. No. 19-7, Evanston requested that the Court take judicial notice of these Coast Guard bulletins as "highly indisputable public records." Dkt. No. 18 at 5 n.14. The Court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see Matter of Manges*, 29 F.3d 1034, 1042 (5th Cir. 1994) (taking judicial notice of certified copies of a deed in the public record). Because the proposed documents are highly indisputable public records, the Court takes judicial notice of them.

[20] Dkt. No. 19-7 at 4; Major Hurricane Harvey, August 25-29, 2017 https://www.weather.gov/crp/hurricane_harvey (last visited September 22, 2020).

[21] Dkt. No. 16-8 at 1.

[22] *See* Dkt. No. 16-4 at 7; Dkt. No. 16-3 at 1.

[23] Dkt. No. 16-4 at 1.

[24] Dkt. No. 16-5 at 1.

[25] *See* Dkt. No. 19-3; Dkt. No. 16 at 3; Dkt. No. 18 at 7.

[26] *See* Dkt. No. 19-3 at 2.

[27] *Id.*

adjuster Stephen Figlin ("Figlin") with Young Adjustment.[28]

On January 3, 2019, Figlin submitted a statement to Evanston asserting that AmSpec's property locations did not sustain damage, but that its claimed loss of business interruption and extra expense incurred as a result of the port closures.[29] AmSpec claims a business interruption loss totaling $912,524.00 and an extra expense claim totaling $11,224.66 over a nine-day period from August 25, 2017 to September 2, 2017.[30]

On April 3, 2019, Evanston denied AmSpec's claim in writing.[31] The denial letter explained that there was no loss as a result of denial of access by an order of civil authority as a result of physical loss or damage.[32]

**B. Procedural History**

On April 24, 2019, Evanston filed a Declaratory Judgment action with the Court requesting that the Court find no coverage under both the Civil Authority and the Dependent Location provisions.[33] Evanston specifically sought a declaration (1) that Evanston timely and appropriately investigated and adjusted the claim; (2) that there is no coverage under the Policy for the claim; and (3) that Evanston properly denied AmSpec's claim.[34]

AmSpec filed counterclaims for violations of the Texas Insurance Code, violations of the Texas Prompt Payment Act, breach of duty of good faith and fair dealing, and violations of the

---

[28] Dkt. No. 18 at 8; *see* Dkt. No 19-4.
[29] *See* Dkt. No 19-4 at 3–4.
[30] Dkt. No. 8 at 2.
[31] *See* Dkt. No. 19-6.
[32] *See id.* at 4.
[33] Dkt. No. 1.
[34] *Id.* at 4.

Texas Deceptive Trade Practices Act.[35] AmSpec's counterclaims assert that AmSpec was required to shut down four of its locations as a result of direct physical damage and the closing of ports by the Coast Guard.[36]

AmSpec filed a motion for partial summary judgment October 4, 2019.[37] Evanston filed its motion for summary judgment on the same day.[38]

## II. Legal Standards

### A. <u>Summary Judgment</u>

Rule 56(a) instructs the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). Where both parties have moved for summary judgment, as to each party's motion, all inferences on summary judgment must be drawn in favor of the nonmoving party, to the extent that if there appears to be some evidentiary support for the disputed allegations, that motion must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *McAllister v. R.T.C.*, 201 F.3d 570, 574 (5th Cir. 2000). The movant is tasked with the initial burden of informing the Court of the basis for the motion and pointing to relevant excerpts in evidence that demonstrate the absence of genuine factual issues. *See Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may also argue that the nonmovant failed to produce evidence in support of at least one element of a cause of action for

---

[35] Dkt. No. 8 at 7–11.
[36] *See id.* at 5.
[37] Dkt. No. 16.
[38] Dkt. No. 17.

which he bears the burden of proof. *See Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).

If the movant satisfies the initial burden, it shifts to the nonmovant who must produce evidence of a genuine factual dispute; he may not merely rest on the allegations in his pleading. *See Coastal Agric. Supply, Inc.*, 759 F.3d at 505 (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In reviewing a motion for summary judgment, the Court bears the responsibility of taking the nonmovant's evidence as true and drawing all reasonable inferences in his favor. *Id.* (quoting *Liberty Lobby, Inc.*, 477 U.S. at 255). But the Court should not accept "[u]nsubstantiated assertions, improbable inferences, [or] unsupported speculation" as sufficient to carry the nonmovant's burden. *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, the Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**B. <u>Policy Interpretation</u>**

In *Cicciarella v. Amica Mutual Insurance Co.*, the Fifth Circuit set forth the method by which insurance policies are interpreted:

> In Texas, insurance policies are controlled by the rules of construction that are applicable to contracts generally. [The Court] will not rewrite the terms of the Policy; instead [the Court will] enforce it as written. [The Court's] primary concern is to give effect to the intentions of the parties as expressed in the instrument. Thus, in interpreting the Policy, [the Court] construe[s] all parts of the document together, giving effect to the intent of the parties. The determination whether terms are ambiguous is a question of law. A contract is ambiguous only "when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning." . . . [The Court] interpret[s] and construe[s] insurance policies

> liberally in favor of the insured, especially when dealing with exceptions and words of limitation.

*Cicciarella v. Amica Mutual Ins. Co.*, 66 F.3d 764, 768 (5th Cir. 1995) (internal citations omitted); *see State Farm Fire & Cas. Ins. Co. v. Keegan*, 209 F.3d 767, 768–69 (5th Cir. 2000).

"When the terms of an insurance policy are unambiguous, a court may not vary those terms." *Amica Mutual Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995) (citing *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965)). "Ambiguous insurance contracts, however, will be interpreted against the insurer." *Tex. Dep't of Housing & Cmty. Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 928 (5th Cir. 1995) (overruled on other grounds) (citing *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)).

What a contract means, and whether a contract is ambiguous, are questions of law for the Court. *See ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018). A contract is not ambiguous if it can be given a certain or definite legal meaning or interpretation, and the Court should construe such a contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). A court should construe an unambiguous contract according to the plain meaning of its express wording. *See ConocoPhillips Co.*, 547 S.W.3d at 874. Unambiguous contracts are enforced as written. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). In this case, the parties do not assert ambiguity.

### III. Analysis

The parties dispute whether the port closure orders were a result of direct physical loss of or damage to property. The dispute focuses on the Policy language stating that a civil authority

order must be one that is "*a result of* direct physical loss of or damage to property."[39]

AmSpec argues it only needs to show that the orders were "*a result of*" physical damage that "was happening elsewhere" to establish coverage under the Policy.[40] Additionally, AmSpec asserts that the "a result of" requirement is less stringent than the "due to" requirement that has been litigated in other cases within the Fifth Circuit where courts found no coverage under similar policies.[41]

Evanston contends there must be "a causal link between any prior direct physical damage and the civil authority order for AmSpec to recover."[42] For support, Evanston argues that the policy language in the instant case is "substantially identical" to the language in *South Texas Medical Clinics, P.A. v. CNA Financial Corp.*, No. 06-CV-4041, 2008 WL 450012 (S.D. Tex. Feb. 15, 2008), where coverage was denied, and therefore coverage should be denied in the instant case.[43]

AmSpec distinguishes the instant case from *South Texas* based on the differing policy language and factual differences.

### A. **Policy Language**

In *South Texas*, the policy required a civil authority order be "due to direct physical loss of or damage" to property for a claim to be covered under the policy. *S. Tex. Med. Clinics*, 2008 WL 450012, at *2. Judge Rosenthal held that there needs to be a "causal link between the prior damage and the civil authority order." *Id.* at *10. *South Texas* was later cited approvingly by the Fifth Circuit in a similar case where it also found no coverage under a civil authority policy with the

---

[39] Dkt. No. 16-2 at 73 (emphasis added).
[40] Dkt. No. 16 at 7 (emphasis added).
[41] *Id.* at 16.
[42] Dkt. No. 18 at 16.
[43] *Id.*

same "due to" language. *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686 (5th Cir. 2011). While Evanston contends these policies are substantially identical to the instant policy language, AmSpec argues that the "a result of" requirement is "plainly less stringent" than the "due to" requirement.[44]

Civil authority policy language varies case to case, but the outcome is largely the same. *See id.* (denying coverage under a civil authority order that was not "due to direct physical loss of or damage to property"); *United Air Lines, Inc. v. Ins. Co. of State of Pa.*, 439 F.3d 128, 135 (2d Cir. 2006) (denying coverage under a civil authority order that was not issued "as a direct result of damage" to the Pentagon); *Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.*, 440 F. Supp. 3d 520, 531 (D.S.C. 2020) (denying coverage under a civil authority order that was not issued "because of damage or destruction of property"); *Not Home Alone, Inc. v. Philadelphia Indem. Ins. Co.*, No. 1:10-CV-54, 2011 WL 13214381, at *7 (E.D. Tex. Mar. 30, 2011), *report and recommendation adopted*, No. 1:10-CV-54, 2011 WL 13217067 (E.D. Tex. Apr. 8, 2011) (denying coverage under a civil authority order that was not "due to direct physical loss of or damage to property"); *Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP v. Chubb Corp.*, No. 09-6057, 2010 WL 4026375, at *3 (E.D. La. Oct. 12, 2010) (denying coverage under a civil authority order that was not issued as "the direct result of direct physical loss or damage to property"); *S. Tex. Med. Clinics*, 2008 WL 450012, at *2, 10 (denying coverage where evacuation order was issued "due to the anticipated threat of damage to the county" and not "due to direct physical loss of or damage to property"); *Paradies Shops, Inc. v. Hartford Fire Ins. Co.*, No. 1:03-CV-3154, 2004 WL 5704715, at *7 (N.D. Ga. Dec. 15, 2004) (denying coverage under a civil authority order

---

[44] Dkt. No. 16 at 16.

that was not a "direct result" of a direct physical loss or damage). *But see Assurance Co. of Am. v. BBB Serv. Co., Inc.*, 265 Ga. App. 35, 593 S.E.2d 7, 7–9 (Ga. Ct. App. 2003) (finding coverage under a civil authority order that was issued "due to direct physical loss of or damage to property").

**B. Coverage**

"The general rule is that civil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property." *Dickie Brennan & Co.,* 636 F.3d at 686–87. Port conditions, which can result in port closures, are issued based on wind conditions and estimated storm arrival times, not prior damage.[45] By their own function, port conditions are not issued as a direct result of physical damage.

However, even if damage would generally be considered in the decision to issue port closures, there was none to consider in the instant case. There is no evidence in the record that Hurricane Harvey damaged any property *before* the Coast Guard began issuing port closures.[46] Hurricane Harvey rapidly developed into a hurricane over the Gulf of Mexico the day before it hit the Texas coastline.[47] Stated as plainly as the Policy, there is no evidence in the record that the civil authority order was issued "as a result of direct physical loss of or damage to property."

AmSpec also argues that, even if the initial order to shut down the ports was precautionary, there would still be coverage for the days in which the ports remained closed after Hurricane

---

[45] *See* Dkt. No. 16-9 at 2–3.
[46] The Court recognizes that Port Arthur was closed after Hurricane Harvey's Texas landfall. There is, however, no evidence in the bulletins showing that damage played a role in the Coast Guard's decision. Therefore, the Court finds that the Coast Guard's decision to close Port Arthur was not a result of damage.
[47] *See* Major Hurricane Harvey, August 25-29, 2017 https://www.weather.gov/crp/hurricane_harvey (last visited September 22, 2020).

Harvey passed through.[48] No additional civil authority orders were issued after the initial port closures. The ports at issue remained closed following Hurricane Harvey's landfall because the Coast Guard needed to "assess the condition of the ports and waterways" before reopening.[49] The fact that the ports remained closed for a few days bears no weight on the fact that the port closures were not issued "as a result of direct physical loss of or damage to property."

Lastly, AmSpec contends that Evanston's interpretation would render the Civil Authority Order endorsement meaningless.[50] The Court disagrees. When, as here, there is no prior damage to consider and the Coast Guard bulletins only contain precautionary language, the causal link between any prior damage and the civil authority order is missing. "Requiring such a causal link between the prior damage and the action by a civil authority does not rewrite the parties' policy, but rather gives effect to the language it contains." *S. Tex. Med. Clinics*, 2008 WL 450012, at *10 (citing *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998) ("We must also attempt to give effect to all contract provisions so that none will be rendered meaningless.")).

AmSpec experienced an interruption in its operations, as AmSpec stated in its own motion, "[a]s a direct result of the Coast Guard's closures."[51] However, for a claim to be covered under the Policy, the Coast Guard's closures needed to be "as a result of direct physical loss of or damage to property."[52] Regardless of whether the phrase "a result of" might be broader than the phrase "due to," there still must be some causal link between the civil authority and damage elsewhere. Thus, without a nexus between the issuance of a civil authority order and damage elsewhere, there is no

---

[48] Dkt. No. 24 at 3.
[49] Dkt. No. 16-10 at 2; *see* Dkt. No. 16-11 at 1.
[50] Dkt. No. 16 at 5.
[51] *Id.* at 10.
[52] Dkt. No. 16-2 at 73.

coverage. Therefore, AmSpec's claim is not covered under the Policy and Evanston, as a matter of law, did not breach its contract with AmSpec.

## C. No Material Facts In Dispute

AmSpec contends that if the Court denies its motion, then "Evanston is not entitled to summary judgment because there are, at minimum, fact issues precluding Evanston's summary judgment."[53] AmSpec cites to Tom Irmiter's ("Irmiter") expert report in an attempt to show factual disputes.[54]

AmSpec asserts that Irmiter's report illustrates evidence of Hurricane Harvey's damage.[55] Therefore, AmSpec argues that "Evanston has not rebutted this undisputed weather data . . . for why there is no coverage."[56] In contrast, Evanston asserts that "Irmiter is not a credible expert and his conclusions do not support AmSpec's argument."[57] The Court need not decide whether Irmiter is a credible expert because his report does not refute the Coast Guard bulletins that ultimately issued port closures. On their face, the Coast Guard bulletins contain only precautionary language and do not reference any existing damage. Thus, Irmiter's report does not create a factual dispute because it does not contradict the bulletins.

Additionally, there is no other evidence or testimony before the Court providing any further context, other than what is stated in the bulletins, as to why the ports were closed. Below are two relevant Coast Guard bulletins that closed ports and suspended all port operations because port condition Zulu was issued, meaning gale force winds were possible within 12 hours.

---

[53] Dkt. No. 24 at 4.
[54] *Id.*
[55] *See* Dkt. No. 16-13.
[56] *Id.*
[57] Dkt. No. 21 at 5.

Update: Coast Guard prepares response efforts for Hurricane Harvey    https://content.govdelivery.com/accounts/USDHSCG/bulletins/1b32e9b

Case 4:19-cv-01498 Document 16-3 Filed on 10/04/19 in TXSD Page 1 of 2

**10**

Receive Updates Enter Email Address   Go



# Update: Coast Guard prepares response efforts for Hurricane Harvey

U.S. Coast Guard sent this bulletin at 08/25/2017 06:43 PM EDT



**News Release**

August 25, 2017
U.S. Coast Guard 8th District Public Affairs Detachment Texas
Contact: 8th District Public Affairs Detachment Texas
Office: (281) 464-4810
After Hours: (832) 293-1293

### Update: Coast Guard prepares response efforts for Hurricane Harvey

HOUSTON — The Coast Guard continues preparations for response efforts for Hurricane Harvey's impact on the coasts of Texas and Louisiana, Friday.

Coast Guard Sector Houston-Galveston and Coast Guard Sector Corpus Christi captains of the port have set port condition zulu for the ports of Houston, Texas City, Galveston, Freeport and Corpus Christi.

Under port condition zulu for Sector Houston-Galveston:

- Vessels and barges are prohibited from transiting the safety zone without the approval of the captain of the port. If transiting is required, contact the Vessel Traffic Service at 281-464-4837.
- All cargo and bunkering operations must cease.
- A radio watch must be maintained on VHF-FM channels 16, 21A, 11, 12.
- All ports, hatches, portholes and other openings shall be closed and secured.
- Sufficient crew must be onboard to tend mooring lines and control the vessel in the event of an emergency and at least two anchors must be ready for letting go.
- Vessels and barges anchored at Anchorage Areas Alpha, Bravo, or Charlie were required to depart anchorage areas prior to 10 a.m. Friday.

Coast Guard Western River Flood Punt teams, who use shallow-draft vessels that are capable of responding

EXHIBIT 2

1 of 2   8/30/2019, 10:38 AM

Update: Coast Guard prepares response efforts for Hurricane Harvey    https://content.govdelivery.com/accounts/USDHSCG/bulletins/1b32e9b

in flooded urban areas, are en route to three staging areas in Texas and Louisiana.

The Coast Guard reminds the public of these important safety messages:

- Stay off the water. The Coast Guard search and rescue capabilities degrade as storm condition strengthen. This means help could be delayed.
- Evacuate as necessary. If mandatory evacuations are set for an area, the public should evacuate without delay.
- Secure belongings. Owners of large boats are urged to move their vessels to inland marinas. Trailerable boats should be pulled from the water. Be sure to secure loose items.
- Stay clear of beaches.
- Stay informed. Information can be obtained through local television, radio, Internet, and VHF radio channel 16.

For the most up-to-date weather information, visit www.weather.gov.

-USCG-

SHARE



Questions for the Coast Guard?
Contact Us

For more Coast Guard news, visit our online newsroom here.

STAY CONNECTED:
   

SUBSCRIBER SERVICES:
Manage Preferences | Unsubscribe | Help

Privacy Policy | GovDelivery is providing this information on behalf of U.S. Department of Homeland Security, and may not use the information for any other purposes.

This email was sent to Email Address

Powered by



Privacy Policy | Cookie Statement | Help

EXHIBIT 2



## Marine Safety Information Bulletin
## 10-17
## August 28, 2017 – 6:00 P.M.
## SET PORT CONDITION ZULU

Effective at 6:00 p.m. CDT on August 28, 2017, the U.S. Coast Guard Captain of the Port, Port Arthur has set **Port Condition ZULU** for the ports of Beaumont, TX; Port Arthur, TX; Orange, Texas; and Lake Charles, LA including all tributaries and connecting waterways. Gale force winds from **Tropical Storm HARVEY** are expected to affect the coasts of southeast Texas and western Louisiana **within 12 hours**. The following restrictions are in effect:

1. All cargo transfer operations must be completed before sustained winds reach 35 MPH.

2. Vessel movements within the affected waterways are prohibited with the following exception: Commercial vessels less than 500 gross tons operating on protected inland waters.

3. All commercial vessels operating in the Port Arthur Vessel Traffic Service (VTS) Area are designated VTS Users. All VTS User movements shall be reported to Vessel Traffic Service Port Arthur at least 15-minutes prior to sailing on channels 01A or 65A VHF-FM or by phone to (409) 719-5070.

Vessels are advised to seek safe harbor in the northern reaches of the waterway. Survey places to moor or anchor to safely ride out a tropical storm or hurricane, and make available the necessary heavy weather mooring gear. Based on prior experience, fishing vessels should moor north of Texaco Island Intersection. **Vessels shall not moor in locations that impede the safe transit of vessels in the channel.** By regulation, vessels intending to moor at 33 CFR 105 facilities must have an agreed upon security arrangement with the facility prior to the vessels mooring.

Questions may be directed as follows:

1. For the Sabine-Neches Waterway:   (409) 719-5070 or
   "Port Arthur Traffic" on VHF-FM 01A / 65A

2. For the Calcasieu Waterway:   (337) 912-0073

**This notice will be posted on the HOMEPORT website http://homeport.uscg.mil. If you have any questions, please call MSU Port Arthur at (409) 723-6500.**

//s//
J. M. TWOMEY
Captain, U. S. Coast Guard
Captain of the Port

EXHIBIT 4

These Coast Guard bulletins only contain precautionary language:

- "[T]rack *projections* show *potential* significant impact to the Southeast Texas and surrounding areas";[58]
- "Coast Guard *prepares* response efforts for Hurricane Harvey";[59]
- "Sufficient crew must be onboard to tend mooring lines and control the vessel *in the event of an emergency*";[60]
- "Gale force winds . . . are *expected* to affect the coasts of southeast Texas and western Louisiana *within 12 hours*";[61]
- "*Based on prior experience*, fishing vessels should moor north of Texaco Island Intersection";[62]

The above warnings do not reference "direct physical loss of or damage to property" along Hurricane Harvey's path. While the language references the potential, future, or predicted impacts on life and property, it does not reference any damage caused by Hurricane Harvey before its landfall in Texas. Instead, the bulletins offer precautionary warnings based on prior hurricane experience and the estimated conditions of the storm.[63] Because there is no evidence before the Court contradicting the plain language contained in the bulletins as to the issuance of the port closures, there is no factual dispute.

AmSpec cites to *Assurance Co. of America v. BBB Service Co., Inc.*, 265 Ga. App. 35, 593 S.E.2d 7 (Ga. Ct. App. 2003) as the most factually on point case.[64] In *Assurance*, before a

---

[58] Dkt. No. 19-7 at 4 (emphasis added).
[59] Dkt. No. 16-8 at 1 (emphasis added).
[60] Dkt. No. 16-3 at 1 (emphasis added).
[61] Dkt. No. 16-5 at 1 (emphasis added).
[62] *Id.*
[63] AmSpec concedes that port condition Yankee (gale force winds possible within 24 hours) is precautionary but insinuates that port condition Zulu (gale force winds possible within 12 hours) is not. (Dkt. No. 16 at 9–10.) AmSpec is correct that the change from Yankee to Zulu means that ports change from open to closed. (*Id.* at 10.) But this change is time-based, not damage based. Thus, it is also precautionary.
[64] AmSpec also contends Evanston's argument that the port closures were precautionary is equivalent to arguing that the closures were preventative. (Dkt. No. 16 at 18.) The Court disagrees with AmSpec's contention and will not consider it.

hurricane's arrival, the emergency-weather decision makers advised the county commission's chairman to issue an evacuation order based on "the fact that the storm had been causing damage in its path, the forecast that the storm was headed [toward their] County, and the anticipated impact of the storm if it reached [their] County." *Id.* at 8. Thus, there was evidence that "actual damage to property other than the insured premises was a basis for the evacuation order." *Id.* at 9.

Here, the undisputed facts differ from those in *Assurance*. As discussed above, none of the Coast Guard bulletins reference any prior "direct physical loss of or damage to property" caused by Hurricane Harvey. Without such evidence, the Court can only determine the basis for the port closures by the plain language contained in the Coast Guard bulletins. Therefore, there are no material facts in dispute precluding summary judgment in Evanston's favor.

## D. <u>Remaining Claims</u>

In addition to its breach of contract claim, AmSpec also asserts the following extra-contractual causes of action: violations of the Texas Prompt Payment Act, violations of the Texas Insurance Code, breach of duty of good faith and fair dealing, and violations of the Texas Deceptive Trade Practices Act. None of these causes of action can survive without a viable breach of contract claim. *See* Tex. Ins. Code § 542.060; *Quibodeaux v. Nautilus Ins. Co.*, 655 F. App'x 984, 987 (5th Cir. 2016). Here, AmSpec's losses are not covered under the Policy and thus Evanston did not breach its contract with AmSpec. Therefore, summary judgment is appropriate in Evanston's favor as to all of AmSpec's remaining causes of action.

## IV. Conclusion

Based on the foregoing, the Court **DENIES** Defendant's partial motion for summary judgment (Dkt. No. 16), and **GRANTS** Plaintiff's motion for summary judgment (Dkt. No. 17).

**SIGNED** in Houston, Texas on October 20, 2020.

Sam S. Sheldon
United States Magistrate Judge